4

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN STONE, Appellant. COMMISSIONER, NEW YORK STATE OFFICE OF MENTAL HEALTH, Respondent.

First Department, June 2, 1988

### APPEARANCES OF COUNSEL

*Tami J. Aisenson* of counsel *(Marc Frazier Scholl* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Stephen J. Harkavy* of counsel *(Marvin Bernstein* with him on the brief; *Ronald N. Gottlieb,* attorney), for appellant.

*Robert L. Schonfeld* of counsel *(Yolanda M. Pizarro* with him on the brief; *Robert Abrams, Attorney-General,* attorney), on behalf of the Commissioner of the New York State Office of Mental Health, respondent.

### OPINION OF THE COURT

ASCH, J.

This is an appeal from a determination granting an application brought by the District Attorney under CPL 330.20 (14) seeking to "recommit" John Stone to a secure mental facility. The appellant takes the position that the proceeding should have been initiated under the Mental Hygiene Law. He urges that the procedures invoked by the New York County District Attorney's Office were improper and that, as a matter of law,

the application under the Criminal Procedure Law should have been dismissed, first, on the ground that there is no statutory basis which serves as a predicate to "recommit" a person who has never been committed before.

Secondly, the appellant urges that if the Criminal Procedure Law is deemed to provide a legal basis for recommitting defendants who were found to be "not responsible" and who were never committed, then CPL 330.20 deprives such person of due process and equal protection under the Constitution. He asserts that the initial finding by the trial court of nondangerousness vitiates any basis for depriving him of his rights under the Mental Hygiene Law.

■ Well over a year has elapsed since the order herein was issued, and it has expired. Concededly, appellant is no longer in a secure facility. However, this appeal is not moot since appellant is prejudiced by the possible continued application of the Criminal Procedure Law to him. Thus, pursuant to the interpretation of the Criminal Procedure Law urged by the People, he faces a possible 10-year period *(see,* CPL 330.20 [1] [o]—an order of conditions is valid for an initial five-year period and may be extended for an additional five years) during which the District Attorney can again proceed to have him committed to a secure facility as having a dangerous mental disorder. In addition to this *Sword of Damocles* hanging over the head of appellant, he is otherwise prejudiced. If the People were required to move pursuant to the provisions of the Mental Hygiene Law, such a proceeding would be subject to the higher burden of the "clear and convincing evidence" standard, rather than the "preponderance standard" applicable under the Criminal Procedure Law *(see, People ex rel. Thorpe v Von Holden,* 63 NY2d 546, 555).

Before May 10, 1984, John Stone had never been involved with the law or a patient in a psychiatric hospital. On that date, he was arrested for allegedly assaulting a policeman who arrived at the scene pursuant to a telephone call from appellant's mother. In September of that year the appellant was voluntarily admitted to St. Luke's-Roosevelt Hospital, in accordance with section 9.13 of the Mental Hygiene Law. Pursuant to the direction of the court, pending trial, he sought psychiatric treatment as an outpatient. After treatment for approximately two months, appellant was discharged. A few months later in 1985, on his own, appellant sought psychiatric treatment and was admitted to Mount Sinai Hospital as an inpatient, once more under section 9.13 of the Mental Hygiene

Law. In April 1985, he was discharged from Mount Sinai to take part in an out-patient program which included living in an apartment facility under the aegis of Mount Sinai Hospital. In September of 1985, the appellant took a plea in the Supreme Court of "not responsible" to a charge of assault in the second degree by reason of mental disease or defect, pursuant to CPL 220.15. After the court approved the plea, it held a hearing to ascertain the mental condition of the appellant at that time, pursuant to CPL 330.20 (6). It decided that John Stone was not suffering from a dangerous mental disorder nor was he mentally ill. Thereupon, the appellant was discharged, subject to an order of conditions, pursuant to CPL 330.20 (7).

It is *this* hearing and determination by the court which establishes the status of the defendant for the purpose of the appeal before us, the law to be applied and the procedures to be followed with respect to him. It should be noted that the Judge determined that he was *not* suffering from a dangerous mental disorder and that he was *not* mentally ill. The dissent refers at various times to Stone's mental status as being dangerous. Actually, the facts do appear to warrant such a conclusion. In any event, this characterization by the dissent is confusing and not accurate since, under the statute, we are only concerned with the status as determined at the initial hearing, and the appellant was found not to be dangerous (or even mentally ill) at that time.

On April 12, 1986, appellant, then voluntarily living as a patient at the Mount Sinai apartment facility, was told that he could not remain there. When advised of an impending plan to commit him to a secure facility the appellant, apparently with the assistance of his mother, left Mount Sinai without permission. He then tried to secure admission at St. Luke's-Roosevelt, unsuccessfully. However, he was admitted as a voluntary patient to St. Vincent's Hospital. On April 23, 1986, upon application by the District Attorney and pursuant to an ex parte order of Justice Peter J. McQuillan, appellant was shipped to Kirby Forensic Center, a secure facility, for examination to decide whether or not he was suffering from a dangerous mental disorder. Thereafter, as a result of the order appealed from, appellant was committed to the custody of the Commissioner of Mental Health for confinement to a secure facility for a period of six months.

█ We find that the Mental Hygiene Law, rather than the Criminal Procedure Law, should have been utilized, under the

circumstances herein, to determine whether or not to commit appellant to a psychiatric facility.

The recommitment procedures set out in CPL 330.20 (14) do not apply to a person who takes a plea on the grounds of not responsible by reason of mental disease or defect where that person was adjudged not to have a dangerous mental disorder, nor to be mentally ill, but was discharged subject to an order of conditions at the culmination of an initial hearing under CPL 330.20 (7).

The Second Department gave an explanation of the working of this act in *People v Flockhart* (96 AD2d 843, 844): "The Insanity Defense Reform Act of 1980 (L 1980, ch 548) established a 'three track' system of procedures in CPL 330.20 for defendants acquitted following a verdict or plea of not responsible by reason of mental disease or defect (see memorandum of Governor Hugh L. Carey on approval of chapter 548 of the Laws of 1980 in NY Legis Ann, 1980, p 219). The procedures applicable to a particular defendant are determined by the court, based upon a finding of his or her present mental condition at the initial hearing held pursuant to CPL 330.20 (subd 6). If the District Attorney establishes, to the satisfaction of the court, that the defendant is suffering from a 'dangerous mental disorder' (see CPL 330.20, subd 1, par [c]), then the court must issue a 'commitment order' committing the defendant to a secure facility operated by the State Commissioner of Mental Health (see CPL 330.20, subd 1, par f; subd 6). Once a defendant has been subject to an order of commitment to a secure facility, the District Attorney must be given notice of all proceedings relating to his or her retention in, furlough, transfer, conditional release or discharge from such facility and is authorized to request a hearing to challenge any change in the defendant's facility or status (see CPL 330.20, subds 8, 9, 10, 11, 12, 13 and 18). If the District Attorney establishes, to the satisfaction of the court, that the defendant is, at that time, still suffering from a dangerous mental disorder, he may prevent the release of such an individual and require his retention in a secure facility. Defendant, who was adjudged to be mentally ill, but not suffering from a dangerous mental disorder, comes within a second category of persons, subject to the provisions of CPL 330.20 (subd 7). Pursuant to that subdivision, '[h]aving found that the defendant is mentally ill, the court must issue an order of conditions and an order committing the defendant to the custody of the commissioner. The latter order shall be

deemed an order made pursuant to the mental hygiene law and not pursuant to this section, and further retention, conditional release or discharge of such defendant shall be in accordance with the provisions of the mental hygiene law.' If the court finds that a defendant falls within a third category of persons, who do not have a dangerous mental disorder, and are not mentally ill it must 'discharge the defendant either unconditionally or subject to an order of conditions' (CPL 330.20, subd 7)."

Thus, the Reform Act with the three-track approach requires, after a psychiatric examination, that "the court must * * * conduct an initial hearing to determine the defendant's present mental condition" (CPL 330.20 [6]). If, at the conclusion of the hearing, the court finds that the defendant has a dangerous mental disorder, it "must issue a commitment order" (CPL 330.20 [6]). If the court finds that defendant does not have a dangerous mental disorder but is mentally ill (as defined in CPL 330.20 [1] [d]), the provisions of articles 9 and 15 of the Mental Hygiene Law apply thereafter. Having found that defendant is mentally ill, but not suffering from a dangerous mental disorder, "[T]he court must issue an order of conditions and an order committing the defendant to the custody of the commissioner. The latter order shall be deemed an order made pursuant to the mental hygiene law and not pursuant to this section, and *further retention, conditional release or discharge of such defendant shall be in accordance with the * * * mental hygiene law.*" (CPL 330.20 [7]; emphasis added.)

Finally, if the court finds that the defendant is not mentally ill and does not have a dangerous mental disorder, it "must discharge the defendant either unconditionally or subject to an order of conditions" (CPL 330.20 [7]).

Appellant falls into this third category. The District Attorney, therefore, had no statutory authority to bring a proceeding pursuant to CPL 330.20 (14) to have appellant "recommitted" to a secure facility, when he had never been committed to such a facility upon the initial hearing.

In the *Flockhart* case *(supra),* a defendant who was found to be mentally ill, but not suffering from a dangerous mental disorder, i.e., in the second "track", could not be governed by the more stringent procedures applicable to defendants confined to a secure facility after a finding that they have a dangerous mental disorder (in the first "track") *(People v Flockhart,* 96 AD2d 843, *supra).* The Second Department

found that defendant, there, was held to an impermissible, more stringent standard than other persons confined to mental institutions pursuant to involuntary civil commitment orders, by a Criminal Term order of conditions which, *inter alia,* gave the District Attorney the power to request a hearing to challenge any change in defendant's status by the Office of Mental Health *(People v Flockhart, supra).*

While the dissent chooses to ignore *People v Flockhart (supra),* there the court, when faced with the application of CPL 330.20 (14), construed it in precisely the manner we have done in this case. "We conclude that Criminal Term has utilized the order of conditions to circumvent the requirement in CPL 330.20 (subd 7) that the defendant, who is adjudged to be mentally ill, but not suffering from a dangerous mental disorder, be committed to the custody of the Commissioner of Mental Health pursuant to a civil order of commitment, which is governed by the procedures for release and retention prescribed in article 9 of the Mental Hygiene Law (see Mental Hygiene Law, §§ 9.21, 9.33, 9.35). By issuing conditions * * * Criminal Term has impermissibly attempted to apply to defendant the more stringent procedures applicable to defendants confined to a secure facility pursuant to an order of commitment or recommitment, after a finding that they have a dangerous mental disorder (CPL 330.20, subd 6). The procedures applicable to the latter category of defendants authorize the District Attorney to exercise 'veto power' over any change in facility or status of those defendants by the Office of Mental Health. The provisions of article 9 of the Mental Hygiene Law, applicable to patients subject to involuntary civil commitment, who do not have a dangerous mental disorder, however, do not authorize the District Attorney to exercise such veto power with respect to their release from a mental hospital, nor do they authorize the participation of the District Attorney as a party in the proceedings related to the retention or the release of such a patient (see Mental Hygiene Law, §§ 9.31, 9.33, 9.34; *People v Helfman,* 91 AD2d 1034). Criminal Term has, thus, impermissibly attempted to subject defendant to more stringent procedures for release and reduction of restrictions than are applicable to other similarly situated persons confined to mental institutions pursuant to involuntary civil commitment orders (cf. *Matter of Torsney,* 47 NY2d 667)" *(supra,* at 844-845).

The dissent invokes the "plain meaning" rule to support its construction of the statute. The "plain rule" as it is usually

formulated provides that where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion. *(Hamilton v Rathbone,* 175 US 414.) There is no ambiguity in the language of this act. The procedures to which the appellant objects were not applicable to the appellant since he was not being "recommitted", as specified by the statute. Significantly, the "plain meaning" as read by the majority, as compared with the construction given the statute by the dissent, was the same as that ascribed to it by the Second Department *(People v Flockhart, supra).*

The dissent views the legislative history of the relevant statute in accordance with that asserted by the People in their brief, and contrary to the interpretation urged by the Mental Hygiene Legal Service and the Second Department.

However, the complete legislative history of the statute does not clarify the divergence in language which exists between the Law Revision Commission and the Legislature.

This highlights the wisdom of the rule that the intention of the Legislature is first to be sought from a literal reading of the act itself, and that if the language is clear, there is no occasion to resort to other means of interpretation (McKinney's Cons Laws of NY, Book 1, Statutes § 92). Furthermore, the most natural and obvious sense of the words and language used will be the way it is interpreted by a court, without resort to forced construction (McKinney's Cons Laws of NY, Book 1, Statutes § 94).

As the dissent points out, the Report of the Law Revision Commission does expressly find that a recommitment order may be applied for at any time during the effective period of an order of conditions issued in conjunction with a defendant's discharge (1981 Report of NY Law Rev Commn in 1981 McKinney's Session Laws of NY, at 2268). It also contains a diagram to show the postverdict procedures of CPL 330.20 *(id.,* at 2276; *see also,* Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 330.20, at 28-30). Pursuant to this diagram, even when a defendant is initially found to be neither mentally ill nor suffering from a dangerous mental disorder, if a court has issued an order of conditions, the District Attorney or Department of Mental Hygiene can still apply for a "recommitment" order at any time during the effective period of such order.

However, despite this language used by the Law Revision

Commission in its report and accompanying diagram, the language used in the statute is *different*. Thus, the act itself, contrary to the apparent intent of the Law Revision Commission, defines a discharge order as one "terminating an order of conditions or unconditionally discharging a defendant from supervision under the provisions of this section" (CPL 330.20 [1] [n]).

Since the Legislature specifically directed, as noted above, that the Mental Hygiene Law would apply to *all* subsequent proceedings for defendants falling in the second track, i.e., mentally ill but not dangerous, the Mental Hygiene Law must logically also apply to all defendants in the third track, i.e., not mentally ill and not dangerous. Further, since "recommitment" must relate back to an initial commitment, the natural and obvious interpretation of CPL 330.20 (14) must be that it does not apply to persons, such as appellant, who were *not* initially committed.

Certainly, where there is ambiguity in legislative intent, the interpretation which is most consistent with the constitutional requirements should be adopted.

As noted above, when a defendant is adjudged not to have a dangerous mental disorder but is mentally ill, "the provisions of articles nine or fifteen of the mental hygiene law shall apply at that stage of the proceedings *and at all subsequent proceedings*" (CPL 330.20 [7]; emphasis added). A fortiori, after an initial hearing where the defendant is found not to suffer from a dangerous mental disorder and is also found not to be mentally ill and is, therefore, discharged, albeit with an order of conditions, any further proceedings seeking hospitalization, etc., must be governed by the provisions of the Mental Hygiene Law. It would be anomalous to apply more stringent and restrictive provisions to appellant, who was discharged after the initial hearing.

Criminal Term was aware of these limitations at the time of the initial hearing, since the order of conditions it issued specifically noted that, while subject to the order, appellant would be "subject to the authority of the N.Y.S. Commissioner of Mental Health to the same extent as any conditionally released patient *within the meaning of Mental Hygiene Law 29.15 (e)*" (emphasis added).

The order further provides that should appellant's condition deteriorate and he require in-patient treatment, that he cooperate with the Commissioner and "submit to hospitalization,

*his admission and retention to be governed by the provisions of article nine of the Mental Hygiene Law"* (emphasis added). CPL 330.20 (14), therefore, which reads in pertinent part: "14. Recommitment order. At any time during the period covered by an order of conditions an application may be made * * * for a recommitment order when the applicant is of the view that the defendant has a dangerous mental disorder", and which formed the basis for Criminal Term's later "recommitment" order, applies not to a defendant such as appellant, who has been initially discharged, but solely to defendants initially committed to a secure facility (CPL 330.20 [6]).

Thus, recommitment hearings pursuant to subdivision (14) are held when applications are made for continued custody of defendants after the expiration of the initial and subsequent commitment periods *(see,* CPL 330.20 [8], [9]) and when application is made for a transfer order (CPL 330.20 [11]).

It seems clear that the existence of a present dangerous mental disorder is the necessary prerequisite for distinguishing between the commitment procedures for those who plead and are acquitted on the basis of their mental state and other persons who are committed civilly *(Jones v United States,* 463 US 354).

The dissent discusses and uses as support for its position a number of relatively recent cases. But those cases are easily distinguishable on their holdings, and certainly on their facts, from the situation before us.

We do not disagree that the standard of proof required for an insanity acquittee may constitutionally differ from that required in a civil commitment *(see, Jones v United States, supra; People v Escobar,* 61 NY2d 431).

However, the State has no interest in punishing insanity acquittees (defendant's plea places him in that class *[see,* CPL 220.15 (3) (f)]) but only in treating them, and the length of hospitalization must depend solely on the acquittee's need (or lack of it) for further in-patient treatment *(Jones v United States, supra,* at 369). Once an insanity acquittee has regained his sanity and is no longer dangerous to society or himself, the confinement must end. "The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous" *(supra,* at 368). The court has thus established dangerousness as the necessary predicate upon which a State may base disparate treatment for insanity acquittees. Therefore, once there is a judicial determination that an insanity

acquittee, as appellant herein, is no longer suffering from a dangerous mental disorder, the presumption that the acquittee poses a danger to society, legitimately drawn from the criminal act, has been rebutted and there can be no continuing discrimination in treatment. This is precisely the situation with which we are presented in this appeal.

A criminal act cannot forever after affect and prejudice an acquittee's right to equal treatment vis-à-vis a person committed in a civil proceeding. Future confinement of the acquittee after the initial determinations adverted to herein must be justified under procedures identical to those that apply to civil commitments.

The New York Court of Appeals has consistently held that the rights of defendants found not responsible under our criminal law must parallel substantially the rights given individuals who are involuntarily committed under the Mental Hygiene Law *(Matter of Torsney [State Commr. of Mental Hygiene—Gold],* 47 NY2d 667, *supra; see also, People v Escobar,* 61 NY2d 431, *supra).*

After the decision in *Jones v United States (supra),* the New York Court of Appeals, following its lead, held that the State could prove dangerous mental illness or mental illness by the lesser burden of preponderance of the evidence *(People v Escobar, supra).* However, while the lesser burden of a preponderance of evidence is applicable to the question of dangerousness, the Court of Appeals has held that the State still must prove mental illness by clear and convincing evidence, acknowledging, therefore, that a distinction in treatment is allowed only upon a finding of dangerousness *(People ex rel. Thorpe v Von Holden, supra,* 63 NY2d, at 555).

Although the due process provisions of the Fourteenth Amendment of the US Constitution and article I, section 6 of the NY Constitution appear superficially similar, our State Due Process Clause has been traditionally accorded wider scope than the Federal guarantee *(see, Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, 159). "In this State, in fact, there is a long tradition of reading the parallel clauses independently and affording broader protection, where appropriate, under the State Constitution." (Kaye, *Dual Constitutionalism in Practice and Principle,* 42 [No. 3] Record of Assn of Bar of City of NY 285, 299.)

Certainly, the Court of Appeals has not hesitated to interpose the State Due Process Clause (NY Const, art I, § 6) in

protecting the rights of the mentally ill *(see, Rivers v Katz,* 67 NY2d 485).

John Stone has always recognized his need for care and treatment and has sought help. His acting out has been minimal and his acts do not seem to have been really dangerous.

There may be some feeling that John Stone "put it over on the public" when he took a plea to an assault charge on the basis of his mental state and that, therefore, because of the benefit he derived, he shouldn't be allowed to get away with it. The undercurrent of the dissent is that since the appellant is a criminal who "got off" because of his claim of mental illness, it is only fair that he be subjected to the more *onerous* standards of the Penal Law than those applied to the mentally ill. However, most respectfully, this seems to miss the entire point. From the record it is quite clear that the appellant does have a problem relating to his own emotional or mental health. If Stone did anything, it was simply out of his agitated mental state, not as a real criminal. He is certainly not a "criminal", as we have used that term. Therefore, it does not seem appropriate to "punish" him according to the punitive strictures of the Penal Law. Rather, it seems more appropriate to deal with him as a peripheral mental patient who can be dealt with under the provisions of the Mental Hygiene Law, instead of as a criminal.

In the instant case, Criminal Term initially adjudged appellant to be neither mentally ill nor dangerous. The hearing Justice sought to discharge him, subject to an order of conditions, and therefore any constitutionally permissible basis for further disparate treatment of appellant ceased to exist. The importance of the underlying determination that appellant was not mentally ill or a threat to society should not be overlooked. This finding ended the presumption of continuing dangerousness which supports differing procedures for insanity acquittees and other candidates for civil commitment. From the time an insanity acquittee is held to be nondangerous, he should be on the same footing as other persons whose mental faculties are in question. There is nothing in the record that demonstrates that appellant could not have been treated in a nonsecure hospital. Appellant's right to be treated in the least restrictive setting was abrogated by applying the Criminal Procedure Law recommitment procedures.

Assuming, arguendo, that the People are correct in their

position that the procedure was sanctioned by statute, the Legislature in revising CPL 330.20 failed to strike a proper balance between the appellant's constitutional right to liberty and the State's interest in protecting the safety of the public.

We deem appellant's notice of appeal an application for leave to appeal pursuant to CPL 330.20 (21) (a), and grant such leave nunc pro tunc.

Accordingly, the order of the Supreme Court, New York County (Carol Berkman, J.), entered July 22, 1986, committing appellant to the custody of the Commissioner of Mental Health for confinement in a secure facility for six months, should be reversed, on the law, and the matter remanded for further proceedings in accordance with the decision herein.

SANDLER, J. (dissenting). In my opinion, subdivision (14) of CPL 330.20 (the Insanity Defense Reform Act of 1980) clearly authorized the proceeding that resulted in the hearing court's finding that the defendant suffered from a dangerous mental disorder, as that term was defined in CPL 330.20 (1) (c)—a finding compellingly supported by the evidence and that mandated the issuance of the recommitment order here challenged.

Assuming that there were some ambiguity in the language of the statute on the issue presented—and I believe that such an ambiguity can be found only by a resolute refusal to apply normal rules of statutory construction, starting with the plain meaning rule—the legislative history makes it clear beyond any reasonable dispute that subdivision (14) was intended to apply under the circumstances presented. It is rare that a court is confronted with legislative history as clear and precise as that disclosed here as to the intent of the Legislature on the very issue before it.

The issue with which we are concerned has its genesis in events that occurred on May 10, 1984. Defendant's mother, claiming that he had beaten her and had threatened to kill her, called the police for protection. After the police arrived, defendant, armed with a baseball bat, injured two of them; one sustained a fracture of the hand, the other bruises on the arm. Defendant was arrested, taken into custody and charged with second degree assault. After arraignment, he was released to receive psychiatric treatment.

Because it is so unusually helpful in providing a realistic understanding of the kinds of problems to which the relevant parts of the statute were addressed, it is appropriate to set

forth in some detail aspects of the defendant's psychiatric history.

At the time of the incident resulting in his arrest, the defendant was receiving treatment from a psychiatrist at the William Allison White Institute. By September 1984, defendant became disturbed by auditory hallucinations commanding him to commit suicide and other violent acts. He applied for admission to Roosevelt Hospital where he was treated as an inpatient for about two months. He was discharged for follow-up treatment as an outpatient, but only attended sporadically. Eventually he discontinued all treatment and medication. Thereafter, he became increasingly disturbed mentally, suffering threatening and recurring hallucinations. On January 30, 1985, he sought treatment at Mount Sinai Hospital and was admitted as an inpatient.

In April 1985, the defendant was discharged as an inpatient and transferred to a special outpatient program. This program, characterized as an "Intensive Treatment Program", permitted him to live in an apartment facility maintained by Mount Sinai while receiving psychiatric treatment. He was supervised on a daily basis, including weekends, in the residence as well as at treatment sessions.

It was during the period that he was in the Mount Sinai program that, on September 19, 1985, defendant, pursuant to CPL 220.15, was permitted to plead not responsible by reason of mental disease or defect to assault in the second degree. An initial hearing was held pursuant to CPL 330.20 (6) to determine whether defendant was mentally ill and whether he was suffering from a dangerous mental disorder. On November 21, 1985, the trial court determined, in accordance with recommendations set forth in psychiatric reports, that defendant presently did not suffer from a dangerous mental disorder and was not mentally ill, and pursuant to CPL 330.20 (7) released him subject to an order of conditions.

What becomes apparent from an examination of the five psychiatric evaluations received by the hearing court in connection with the acceptance of the defendant's plea and the subsequent determination at the postverdict hearing, is that all of the examiners, including the examiner whose services were specifically requested by defendant's counsel, were in agreement that defendant in fact suffered from a significant chronic mental illness. All agreed that he suffered from paranoid schizophrenia. It is equally apparent from the several

reports that the examiners, although finding the defendant not to be dangerous to himself or others at the time of the examinations, recognized that the character of his illness presented a potential for violent behavior in the future.

The reason for the recommendation of the examiners to the court, adopted by the court, that the defendant be found not to suffer from a dangerous mental disorder and not to be mentally ill but that he be released on an order of conditions, may be found in the distinctive aspects of the definition of mental illness in CPL 330.20 (1) (d). That paragraph provides, in relevant part, as follows: " 'Mentally ill' means that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment".

At the time of the several examinations, and at the time of the trial court's order, defendant was an apparently willing participant in a highly regarded residence psychiatric program of Mount Sinai Hospital. His participation in that program clearly tended to establish that he was not "unable to understand the need for such care and treatment". Even more important, the psychiatric program in which defendant was participating at Mount Sinai was highly regarded by the examiners and believed to be an appropriate program for his condition. In any event, it is clear that it was the judgment of the examiners, understandably accepted by the court, that it was not "essential" to the defendant's welfare to commit him to a State institution.

It is a radical distortion of the reality of these events to conclude from the nature of the court's findings that the court did not believe the defendant's mental condition to be a matter of ongoing urgent concern. Quite the contrary. The record is clear that both the examiners and the court understood that the defendant suffered from a major chronic mental illness, and one from which he would continue to suffer for some time to come. In accordance with this understanding, an order of conditions required defendant to continue to receive outpatient treatment at Mount Sinai Hospital, to live in the hospital's supervised residence, to take the prescribed psychotropic medication, and to attend therapy sessions and group activities. In addition, the order authorized immediate hospitalization in the event defendant's condition deteriorated.

Defendant remained in the Mount Sinai program, but his condition worsened. On February 12, 1986, he was admitted as an inpatient and remained hospitalized until April 19, 1986, except for a short period. In April 1986 his treatment team, faced with defendant's deteriorating mental condition even while hospitalized, concluded that a transfer to a secure facility was necessary.

Defendant apparently discovered that such a transfer was impending, and on April 12, 1986, with his mother's assistance, eloped from the hospital. Shortly thereafter, while residing with his mother, defendant became acutely suicidal. His mother brought him to St. Luke's Hospital, where he was refused admission. Several days later, on April 23, 1986, he was admitted to St. Vincent's Hospital. In the course of that admission he assaulted a doctor.

On April 24, 1986, the District Attorney applied for an examination order temporarily transferring defendant to a secure facility for evaluation, an application made with the consent both of the defense attorney assigned to the original criminal action and the New York State Office of Mental Health. On the same date an order was issued directing an examination of defendant to determine his current mental condition. Following an evidentiary hearing, the trial court concluded that the defendant was currently suffering from a dangerous mental disorder and issued a recommitment order placing defendant in a secure facility for six months, the order here sought to be vacated.

Turning to the statutory issue that divides the court, it is clear that the purpose of the Insanity Defense Reform Act of 1980 was to "better ensure the protection of the public from future dangerous acts of individuals found not responsible, while safeguarding the rights of such individuals." (1980 McKinney's Session Laws of NY, at 1880). Central to the statute is the requirement that a defendant found not responsible for a criminal act by reason of mental disease or defect be examined by the Department of Mental Health to determine his present mental condition, and a timely hearing thereafter held to determine the defendant's present mental condition.

The statute authorizes three possible findings following the mandated hearing, and sets forth three different procedures, or, alternative "tracks", to apply to each of the possible findings. The possible findings are: (1) that the defendant has

a "dangerous mental disorder", (2) that the defendant does not have a dangerous mental disorder but is mentally ill, and (3) that the defendant does not have a dangerous mental disorder and is not mentally ill.

CPL 330.20 (6) provides: "If the court finds that the defendant has a dangerous mental disorder, it must issue a commitment order."

Subdivision (7) is addressed to the two alternative findings described above, one of which gives rise to the issue with which we are concerned: "Initial hearing civil commitment and order of conditions. If, at the conclusion of the initial hearing conducted pursuant to subdivision six of this section, the court finds that the defendant is mentally ill but does not have a dangerous mental disorder, the provisions of articles nine or fifteen of the mental hygiene law shall apply at that stage of the proceedings and at all subsequent proceedings. Having found that the defendant is mentally ill, the court must issue an order of conditions and an order committing the defendant to the custody of the commissioner. The latter order shall be deemed an order made pursuant to the mental hygiene law and not pursuant to this section, and further retention, conditional release or discharge of such defendant shall be in accordance with the provisions of the mental hygiene law. If, at the conclusion of the initial hearing, the court finds that the defendant does not have a dangerous mental disorder and is not mentally ill, the court must discharge the defendant either unconditionally or subject to an order of conditions."

Notably, the first appearance in a substantive part of the statute of the phrase "order of conditions" occurs in subdivision (7), where the court was required to issue such an order upon a finding that the defendant is mentally ill but does not have a dangerous mental disorder, and the court was given the option of issuing such an order on a finding that the defendant does not have a dangerous mental disorder and is not mentally ill. CPL 330.20 (1) (o) defines "order of conditions" as follows: "[A]n order directing a defendant to comply with this prescribed treatment plan, or any other condition which the court determines to be reasonably necessary or appropriate, and, in addition, where a defendant is in custody of the commissioner, not to leave the facility without authorization. The order shall be valid for five years from the date of its issuance, except that, for good cause shown, the court may extend the period for an additional five years." Significantly,

the term "order of conditions" was introduced into the law in CPL 330.20, was plainly designed as an order to be availed of in furtherance of the purposes of that statute, and was given legal significance in CPL 330.20 in a subdivision (14) proceeding, and only in a subdivision (14) proceeding. The Mental Hygiene Law contains no reference to an order of conditions, and does not disclose the slightest basis for the conclusion that the issuance of an order of conditions when required or authorized in CPL 330.20 has any relevance to a proceeding under the Mental Hygiene Law, or serves any function whatever in connection with such a proceeding. It is surely untenable to suppose that the Legislature intended an order of conditions issued under subdivision (7) to be governed by a law that contains no reference to such an order and assigns no function to it. The untenability of this thesis is conclusively established by the explicit language of the subdivision which, having provided that the court, on a finding that the defendant is mentally ill, "must issue an order of conditions and an order committing the defendant to the custody of the commissioner", went on to say that "[t]he latter order shall be deemed an order made pursuant to the mental hygiene law and not pursuant to this section", and includes no such comment with respect to the order of conditions.

Because of the central importance of the order of conditions to the issue with which we are concerned, it may be helpful to note briefly the varying references to such an order that appear in subdivisions of CPL 330.20 following subdivision (7) and leading up to subdivision (14).

Subdivision (8) is primarily concerned with the responsibilities of the Commissioner with whom a defendant is in custody pursuant to a commitment order to insure a hearing prior to the expiration of the commitment order at which the defendant's current mental condition may be reevaluated. This subdivision provides for three alternative findings essentially the same as those described earlier, with one limited, though interesting, exception. If the court finds on the new hearing that the defendant does not have a dangerous mental disorder or is not mentally ill, it must issue a release order and an order of conditions. This is to be distinguished from the provision in subdivision (7) which provides that with regard to such a finding after the first postverdict examination, the court has the discretion as to whether to issue an order of conditions.

The term is used in a comparable way in subdivision (9)

involving a hearing with regard to a defendant in custody pursuant to a first retention order.

Subdivision (11) regulates the circumstances under which a defendant in custody pursuant to a retention order or a recommitment order may be transferred from a secure to a nonsecure facility upon a finding that the defendant no longer has a dangerous mental condition, or that such an order would be consistent with the public safety and welfare of the community and the defendant. The statute mandates that the issuance of a transfer order must also be accompanied by an order of conditions.

Subdivision (12) titled "Release order and order of conditions" authorizes the Commissioner to apply for a release order when a defendant in his custody pursuant to a retention order or recommitment order no longer in his opinion has a dangerous mental disorder and is no longer mentally ill. This subdivision provides for essentially the same alternative possible findings which have been described above. As here relevant, it provides that if the court issues either a transfer order or a release order, the order must be accompanied by an order of conditions.

The section with whose construction we are primarily concerned is subdivision (14), captioned "Recommitment order", which provides in relevant part: "At any time during the period covered by an order of conditions an application may be made by the commissioner or the district attorney to the court that issued such order, or to a superior court in the county where the defendant is then residing, for a recommitment order when the applicant is of the view that the defendant has a dangerous mental disorder." The section goes on to provide: "If the court finds that the defendant has a dangerous mental disorder, it must issue a recommitment order."

It is undisputed that the application seeking a recommitment order occurred here during a "period covered by an order of conditions". The evidence is clear that the District Attorney was of the view that the defendant had a dangerous mental disorder. The evidence convincingly supports the court's conclusion that the defendant suffered from a dangerous mental disorder. Accordingly, under the statute the court was required to issue a recommitment order, and did so.

The legal difficulty perceived in the court's opinion arises from the use of the term "recommitment order", and the view that this term necessarily implied that the proceeding autho-

rized in subdivision (14) was to be available only with regard to someone who at some earlier point, presumably at the time of the first examination, had been the subject of a commitment order.

There are three major difficulties with this construction of the statute, which separately and collectively disclose it to be a palpable misreading of that which was said in the subdivision and that which was meant. First, the statute does not define recommitment order as an order issued with regard to someone who had previously been the subject of a commitment order. The two phrases are carefully defined in the definitional portion of the statute. Section 330.20 (1) (f) reads: " 'Commitment order' or 'recommitment order' means an order committing a defendant to the custody of the commissioner for confinement in a secure facility for care and treatment for six months from the date of the order."

As is apparent from the definition, it contains no suggestion that a recommitment order is an order available only with regard to someone previously subject to a commitment order. On the contrary, the terms are defined in precisely the same way. What becomes clear from a reading of the statute as a whole is that the term "commitment order" was used where there was a finding that the defendant had a dangerous mental disorder at the first postverdict hearing, and that the term "recommitment order" was used where such a finding was made at a subdivision (14) hearing.

The reason for the use of two terms defined in precisely the same way—"commitment order" and "recommitment order"— becomes evident when one compares the provisions of subdivision (8) regulating the obligations of the Commissioner in whose custody the defendant is pursuant to a commitment order, and subdivisions (11) and (12) regulating the responsibility of the Commissioner in whose custody a defendant is pursuant to a recommitment order or a retention order. It is apparent from a comparison of these sections that the authors used two separate terms with the same definition because they intended to make a distinction between the procedures available with regard to a defendant in custody pursuant to a commitment order and the procedures available where a defendant was in custody pursuant to a recommitment order or a retention order.

Thus, in subdivision (8) it is provided that when a defendant is in the Commissioner's custody pursuant to a commitment

order, "the commissioner must, at least thirty days prior to the expiration of the period prescribed in the order, apply to the court * * * for a first retention order or a release order." Under subdivision (11), however, where the defendant is in the Commissioner's custody pursuant to a retention order or a recommitment order, the Commissioner is authorized to apply at any time for a transfer order, when he is "of the view that the defendant does not have a dangerous mental disorder or that, consistent with the public safety and welfare of the community and the defendant, the clinical condition of the defendant warrants his transfer from a secure facility to a non-secure facility." Similarly, subdivision (12) authorizes the Commissioner, with regard to a defendant in his custody pursuant to a retention order or recommitment order, to apply for a release order, once again without any limitation of time, when the Commissioner "is of the view that the defendant no longer has a dangerous mental disorder and is no longer mentally ill."

Second, the construction adopted in the court's opinion deprives of all legal significance the use of the term "order of conditions" in subdivision (7). At no point in the statute other than in subdivision (14), and at no place in the Mental Hygiene Law, are legal consequences attached to this term, which was introduced into the law, and defined, in CPL 330.20. Under the court opinion's construction, the issuance of an order of conditions has legal consequences only where issued with regard to someone who had previously been the subject of a commitment order. Under this perplexing view, the Legislature engaged in a meaningless verbal exercise, wholly without legal meaning or consequence, when in subdivision (7) it mandated the court to issue such an order upon a finding "that the defendant is mentally ill but does not have a dangerous mental disorder", and when it extended to the hearing court the right to issue such an order upon a finding that the defendant did not suffer from a dangerous mental disorder and was not mentally ill. This approach violates a fundamental canon of statutory construction, cannot be right, and in fact is not right.

Finally, it is offensive to common sense to conclude that the authors of this law would have used the formulation set forth in subdivision (14) if they intended to limit the applicability of the proceeding set forth in that subdivision to those defendants who had previously been the subject of a commitment order. As we have seen, the subdivision opens with the follow-

ing language: "At any time during the period covered by an order of conditions an application may be made". As we have also seen, several of the subdivisions in the statute preceding subdivision (14) mandate the hearing court under varying described circumstances to issue an order of conditions, and in the one situation presented, authorizes the hearing court to do so. If the authors of the statute intended to limit the applicability of the subdivision (14) proceedings to the single situation in which an order of conditions had been issued with regard to someone previously the subject of a commitment order, it is inconceivable that they would not have said so in any number of ways that could have readily conveyed that thought. The expression of such an intent, clearly an important one, did not present a complicated drafting problem. It makes no sense at all to suppose that the authors would have undertaken to communicate such an intent through the use of the term "recommitment order" on the apparent expectation that Judges would shrewdly understand that the term was to be given a meaning not embraced in the definition provided in the statute.

Any doubt that subdivision (14) authorized the very proceeding that occurred here under the undisputed circumstances disclosed in the record is conclusively eliminated by a consideration of the relevant legislative history.

CPL 330.20 was drafted by a committee of the Law Revision Commission. The statute as passed was in all respects relevant to the issue presented identical with the statute as proposed by that committee. The then proposed statute was accompanied by a Report of the Law Revision Commission to which was attached a flow chart diagraming the procedures that were to follow each of the several authorized findings at the first examination described earlier. *(See,* 1981 Report of NY Law Rev Commn [1981 NY Legis Doc No. 65] in 1981 McKinney's Session Laws of NY, at 2251 *et seq.)*

Both the Report of the Law Revision Commission and the flow charts addressed precisely the alternative procedures that were to follow each of the three alternative findings authorized under the law. Both the relevant discussion in the report and the diagramatic description in the flow chart leave no room for reasonable doubt that it was intended that the procedure set forth in subdivision (14) was to be available both where an order of conditions was issued in connection with a finding that the defendant was mentally ill but did not have a dangerous mental disorder, and where such an order of condi-

tions was issued in connection with a finding, as was made here, that the defendant did not have a dangerous mental disorder and is not mentally ill.

Thus, with regard to a finding at the first postverdict examination that the defendant does not have a dangerous mental disorder but is mentally ill, the report said (1981 McKinney's Session Laws of NY, at 2268):

"(ii) Defendant does not have a dangerous mental disorder but is mentally ill.

"If, at the conclusion of the initial post-verdict hearing, the court finds that the defendant does not have a dangerous mental disorder but is mentally ill, the provisions of the Mental Hygiene Law shall apply at that stage of the proceedings and that law shall govern all subsequent proceedings regarding retention, conditional release or discharge. However, having found the defendant mentally ill, the court must issue an order of conditions and an order committing the defendant to DMH. The latter order shall be deemed an order made pursuant to the Mental Hygiene Law (Proposed CPL 330.20, subd. 7.)

"At any time during the effective period of the order of conditions, the district attorney or the Commissioner may apply to the court for a recommitment order if he believes that the defendant has a dangerous mental disorder. If, after a hearing on such application, the court finds that the defendant has a dangerous mental disorder, it must issue a recommitment order directing the defendant to be committed to a secure facility in DMH for six months. If a recommitment order is issued, subsequent proceedings regarding retention or release of the defendant shall be governed by the provisions of proposed CPL 330.20. (Proposed CPL 330.20, subd. 15.)" (Subdivision [15] in the report was renumbered as subdivision [14] in the statute as passed because of the deletion of one section not relevant to the issue presented.)

The report then went on to describe the procedure to be followed following a finding at the first postverdict hearing that the defendant does not have a dangerous mental disorder and is not mentally ill, precisely the situation presented here:

"(iii) Defendant does not have a dangerous mental disorder and is not mentally ill.

"If, at the conclusion of the initial post-verdict hearing, the court finds that the defendant does not have a dangerous mental disorder and is not mentally ill, the court must dis-

charge the defendant either unconditionally or subject to an order of conditions. (Proposed CPL 330.20, subd. 7.)

"At any time during the effective period of an order of conditions issued in conjunction with a defendant's discharge, the district attorney or the Commissioner may apply to the court for a recommitment order if he believes that the defendant has a dangerous mental disorder. If, after a hearing on the application, the court finds that the defendant has a dangerous mental disorder, it must issue a recommitment order directing the defendant to be committed to a secure facility in DMH for six months. If a recommitment order is issued, subsequent proceedings regarding retention or release of the defendant shall be governed by the provisions of proposed CPL 330.20. (Proposed CPL 330.20, subd. 15.)" (1981 McKinney's Session Laws of NY, at 2268.)

Exactly the same procedures are set forth with equal clarity and lack of ambiguity in the flow chart that had been annexed to the report, and which was appended to the Bellacosa Practice Commentary to CPL 330.20 because of the commentator's view that it "provides an excellent graphic paraphrase of the new provisions". (McKinney's Cons Laws of NY, Book 11A, at 23.)

It is difficult even to envisage legislative history more dispositive of the precise issue of statutory construction presented than that disclosed in the above-quoted portions of the report. I have read with care the discussion in the majority opinion on the issue of statutory construction, and am unable to perceive in it a comprehensible explanation of the basis on which the court majority, in the face of absolutely clear, dispositive evidence of legislative intent on the very issue presented, have concluded that the statute did not authorize a proceeding that it clearly authorized, and that it was indisputably intended to authorize.

Let me add that nothing in *People v Flockhart* (96 AD2d 843), so heavily relied on in the court's opinion, provides the slightest support for the statutory construction adopted in that opinion, or, indeed, has anything whatever to do with the issue before us. In *People v Flockhart (supra),* the Second Department was presented with an order of conditions accompanying a civil commitment, which undertook to control and regulate the commitment of the defendant in a manner not authorized by the Mental Hygiene Law, and clearly inconsistent with that law. The court was not confronted with the

issue presented here, and accordingly said nothing relevant to that issue, as to whether an order of conditions issued pursuant to subdivision (7) justified a subdivision (14) hearing under the explicit language of that subdivision, which, as already observed, opened with the following sentence: "At any time during the period covered by an order of conditions an application may be made by the commissioner or the district attorney to the court that issued such order, or to a superior court in the county where the defendant is then residing, for a recommitment order when the applicant is of the view that the defendant has a dangerous mental disorder."

Assuming that subdivision (14) was construed to authorize the proceeding that occurred under the circumstances presented, the defendant contends that the subdivision as so construed would violate his constitutional rights. The constitutional argument presented by the defendant, and apparently adopted in the court's opinion, asserts that a failure to find at the first postverdict or postplea hearing that the defendant then suffered from a dangerous mental condition deprives the Legislature of the constitutional right, in any later commitment proceeding, to make any distinction between defendants acquitted of a crime as not responsible by reason of mental disease, and others, even though it were determined at such a hearing that the defendant suffered from a mental disease that made it essential for his welfare to be committed to a State institution, or alternatively, was found to suffer from an ongoing mental condition that justified an order of conditions directing his compliance with a described treatment plan.

I know of no currently viable legal authority that supports this thesis, which is directly contrary to the clear import of the most recent authoritative decisions of the United States Supreme Court and the New York Court of Appeals, and which ultimately rests on a failure to appreciate the realistic problem of public policy presented by a defendant who committed a crime and was acquitted because of a mental disease, and who continued at the time of the hearing to suffer from an ongoing mental condition related to the crime he committed.

An analysis of the constitutional issue presented necessarily starts with a consideration of the opinions of the United States Supreme Court in *Jones v United States* (463 US 354) and of the New York Court of Appeals in *People v Escobar* (61 NY2d 431). An accurate understanding of the fundamental principles set forth in these two opinions is essential to a

thoughtful consideration of the constitutional issue here raised. With respect, the discussion of the relevant authorities in the court's opinion seriously misrepresents that which was set forth in *Jones v United States (supra)* and in *People v Escobar (supra)*. In particular, the court's opinion turns the Supreme Court's opinion in *Jones v United States (supra)* on its head, and presents as supportive of its constitutional conclusion an opinion which on any realistic evaluation strongly supports the constitutionality of the statute as applied to this defendant under the circumstances set forth in the record.

The principle is now surely firmly established, if it were ever in doubt, that an acquittal of a defendant by reason of his mental disease, implicit in which is a determination that the defendant had indeed committed the crime with which he was charged, allows under the Constitution some differences in subsequent commitment proceedings addressed to him from those prescribed for other persons.

In *Jones v United States (supra)*, the Supreme Court sustained the constitutionality of District of Columbia statutory provisions with regard to a criminal defendant acquitted by reason of insanity which provided that at a subsequent judicial hearing to determine his eligibility for release from commitment the defendant had the burden of proving by a preponderance of the evidence that he is no longer mentally ill or dangerous, and, assuming he did not discharge that burden, further provided that at any subsequent judicial hearing to determine the defendant's eligibility for release the burden of proof continued to be on defendant to establish his eligibility by a preponderance of the evidence.

The constitutionality of these provisions was sustained notwithstanding the fact that the District of Columbia civil commitment procedures, in accordance with the constitutional requirement set forth in *Addington v Texas* (441 US 418, 425), provided that in civil commitments an individual may be committed only upon clear and convincing proof by the government that he is mentally ill and likely to injure himself or others. In addition, the constitutionality of the District of Columbia Code provisions was sustained by the court notwithstanding the further fact that at the time the defendant unsuccessfully sought his release at a second hearing he had already been committed for a period of time in excess of the maximum sentence that he could have received if he had been convicted of the criminal charge.

The single issue dividing the Supreme Court was whether or not the code provisions under which the burden of proof rested upon the defendant to secure his release could constitutionally apply after the expiration of the maximum sentence that he could have received under the criminal charge, the dissenting Justices believing that the Constitution required the application of the usual civil commitment standard of proof after the defendant had been committed for the maximum period of time that he could have received under the criminal charge.

The majority opinion in *Jones v United States* (463 US 354, *supra)* is explicit that a defendant acquitted of a criminal charge by reason of insanity could constitutionally be committed indefinitely until that defendant was able to establish by a preponderance of the evidence that he was no longer mentally ill or dangerous. In reaching this determination, the Supreme Court observed that inherent in an acquittal for insanity is a determination that the defendant beyond a reasonable doubt committed the criminal act charged, and that such a determination (at 364) "certainly indicates dangerousness * * * Indeed, this concrete evidence generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." Nor did the Supreme Court believe that the inference of dangerousness could not reasonably be inferred in a case in which, as in *Jones,* the crime charged involved no element of violence.

The Supreme Court went on to say *(supra,* 363 US, at 366): "It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment. The precise evidentiary force of the insanity acquittal, of course, may vary from case to case, but the Due Process Clause does not require Congress to make classifications that fit every individual with the same degree of relevance."

Following an analysis of the opinion in *Addington v Texas (supra)* in which the court had determined that in civil commitment proceedings the Constitution required proof by clear and convincing evidence, the court went on to say *(supra,* 463 US, at 367-368): "We therefore conclude that concerns critical to our decision in *Addington* are diminished or absent in the case of insanity acquittees. Accordingly, there is no reason for adopting the same standard of proof in both cases. '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey* v. *Brewer,* 408 US

471, 481 * * * The preponderance of the evidence standard comports with due process for commitment of insanity acquittees."

In *People v Escobar* (61 NY2d 431, *supra*), the Court of Appeals was required to determine whether the burden of proof placed upon the People under CPL 330.20—" 'to the satisfaction of the court'—is fulfilled when the People establish by a fair preponderance of the credible evidence, rather than by clear and convincing evidence, that the defendant continues to suffer from a dangerous mental disorder or is mentally ill" (at 434-435). In determining that the fair preponderance test was to be applied under the statute, and that it was constitutional, the court preliminarily concluded that the statutory language "to the satisfaction of the court" was intended to require (at 438) "only that the burden comply with Federal constitutional requirements."

Observing that in *Jones v United States (supra)* the Supreme Court had sustained the statute that imposed the burden of proof on a defendant to establish that he has regained his sanity in order to be released, the court went on to say *(supra, 61 NY2d, at 439-440)*: "It necessarily follows that in view of the placement of the burden of proof upon the District Attorney, it is constitutionally permissible to only require the District Attorney to prove defendant's mental defect by a preponderance of the evidence rather than by the more demanding clear and convincing standard."

The Court of Appeals went on to say *(supra, 61 NY2d, at 440)*: "The preponderance standard not only satisfies due process and equal protection requirements, but also best fulfills the Legislature's purpose in enacting the subject statutory scheme—'to ensure the safety of the public and to safeguard the rights of defendants found not responsible'. (1981 Report of NY Law Rev Comm, McKinney's Session Laws of NY, 1981, at p 2251.) To require the District Attorney to prove defendant's mental disorder by clear and convincing evidence would impose far too heavy a burden upon the prosecutor, who a short time earlier was required to demonstrate (but was unsuccessful in his attempt at trial) by proof beyond a reasonable doubt that the defendant was criminally responsible when he committed the subject crimes. Imposing the heavier burden would unnecessarily increase the risk that a person suffering from a mental disorder who had previously engaged in criminal behavior will be released from custody prematurely. The dangers to the public and the defendant himself

from such a result are self-evident and it is precisely that situation which we believe the Legislature sought to avoid. We hold, therefore, that the preponderance of the evidence standard, and not that requiring clear and convincing evidence, should have been applied at both the initial commitment and first retention hearings."

The court went on explicitly to describe as no longer viable in light of the Supreme Court decision in *Jones (supra),* the dicta in *Matter of Torsney (State Commr. of Mental Hygiene—Gold)* (47 NY2d 667, 676) that had indicated "that the same procedural and substantive standards should be applied in both civil commitment proceedings and proceedings to continue insanity acquittees in the custody of the commissioner" *(supra,* 61 NY2d, at 440-441).

In a significant footnote *(supra,* at 439, n 4), the Court of Appeals went on to say: "Although not vigorously disputed by defendant, we note that our decision today fully comports with equal protection guarantees as well as due process even though we impose a less demanding burden of proof in this case than we would in a case such as *Addington v Texas* (441 US 418) where the State seeks to commit an individual who has not engaged in criminal conduct. As the Supreme Court recognized in *Jones v United States* (463 US [354, 367], 103 S Ct 3043, 3051), there are important 'differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof.' (See, also, *Warren v Harvey,* 632 F2d 925, 930, cert den 449 US 902.)"

In his appellate presentation, petitioner accurately points out that in this case we are presented with a determination at the first postverdict hearing that defendant did not have a dangerous mental disorder and was not mentally ill, and that this finding presents an issue not explicitly addressed by the Supreme Court in *Jones* (463 US 354, *supra),* or by the Court of Appeals in *Escobar* (61 NY2d 431, *supra).* I agree that the alternative findings authorized by the statute—mentally ill but without a dangerous mental disorder, and not mentally ill and without a dangerous mental disorder—introduce a factor relevant to a consideration of the validity of subsequent procedures with regard to such a defendant. This was fully understood by the authors of CPL 330.20, and was in fact fundamental to the three-track approach meticulously set forth in that statute, which carefully distinguished among the procedures to follow a determination that the defendant had a

dangerous mental disorder, a determination that he was mentally ill but did not have a dangerous mental disorder, and a determination that the defendant did not have a dangerous mental disorder and was not mentally ill.

What seems to me fundamentally untenable is the thesis that in the absence of a finding at the first postverdict hearing that the defendant then has a dangerous mental disorder, the Legislature may not constitutionally make any distinction between insanity acquittees and others. Upon analysis, it becomes apparent that this sweeping constitutional conclusion, supported only by a casual and misleading discussion of the applicable authorities, rests on a transparently erroneous identification of the inference of dangerousness from a criminal act committed by a person found not responsible because of mental disease with the concept of a dangerous mental disorder as defined in CPL 330.20 (1) (c). But it is obvious that the two concepts are quite distinct, and that the inference of dangerousness from a crime committed by a person not responsible because of mental illness which the Supreme Court found in *Jones (supra)* to justify some differences in treatment of such persons from those who did not commit a crime, is in no way extinguished for constitutional purposes by a determination at the hearing that the defendant does not suffer from a dangerous mental disorder, at least where the hearing results in a determination that the defendant is mentally ill, making it essential to his welfare that he be committed to a State institution, or where it is found that he suffers from a mental condition that requires ongoing treatment.

The thesis set forth in the court's opinion is fundamentally inconsistent with the clear meaning of the principles set forth in *Jones (supra)*, and endorsed by the Court of Appeals in *Escobar (supra)*, and in particular with the statement in *Jones* quoted with approval by the Court of Appeals in *Escobar*, that there are "important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof." *(See, Jones v United States, supra,* at 367; *see, People v Escobar, supra,* at 439, n 4.)* In addition, it disregards the realities, vividly illustrated in this very case, which the Legislature undertook to address in those parts of the statute here challenged.

A strikingly curious aspect of the court's constitutional analysis is that it would logically require striking down an unconstitutional subdivision (14) even under the interpretation of that subdivision adopted in the court's opinion. For if a

finding at the first postverdict hearing that a defendant does not suffer from a dangerous mental disorder eliminates any constitutional right to distinguish between such a defendant and others, it is difficult to see why a similar conclusion should not be reached if the determination that the defendant does not suffer from a dangerous mental disorder is made at a later hearing.

Let us consider realistically the problem presented by a defendant found at the hearing not to suffer from a dangerous mental disorder but to be mentally ill. That defendant has committed a crime. He has been found not responsible because of mental disease or defect. At the hearing it has been determined that though not suffering from a dangerous mental disorder he is mentally ill, an illness surely related to the crime which he committed, and that it is essential to his welfare to commit him to a State institution.

Is it really conceivable that the Legislature lacks the constitutional power to mandate the court to issue an order of conditions requiring the defendant to conform to a prescribed treatment plan? And if, during the period covered by the order of conditions, the defendant's mental condition deteriorates and it appears that he is now suffering from a dangerous mental disorder, is it tenable to find that the Legislature lacks the constitutional power to prescribe a procedure for such a defendant that differs in any way from the procedure prescribed for persons who had never committed a crime?

The same analysis is applicable to the finding with which we are concerned, as the facts of this case graphically demonstrate. Once again, in this situation the defendant has committed a crime and was found not responsible by reason of mental disease or defect. At the hearing it is determined that the defendant is not suffering from a dangerous mental disorder and that he is not mentally ill under a statutory definition of that term which embraces the requirement that commitment to a State institution is essential to the defendant's welfare, and also requires a finding that the defendant's judgment is so impaired that he is unable to understand the need for such care and treatment. It is, however, determined that the defendant in fact suffers from a mental illness, once again surely related to the crime that he committed, that requires a course of treatment. Surely, the Legislature may constitutionally authorize the court to issue an order of conditions requiring the defendant to conform to a prescribed course of treatment.

And once again, if during a period covered by that order of conditions, the defendant's mental condition deteriorates and it appears that he is now suffering from a dangerous mental disorder, may not the combined effect of the crime he committed, the continuing mental condition disclosed at the hearing, and the apparent deterioration of his mental condition so that he may now suffer from a dangerous mental disorder provide a sufficient basis for a Legislature to prescribe a procedure for such a defendant that in some respects differs from those who did not commit a crime?

This is not to say that the Legislature could not reasonably have taken a different view of the matter and decided that no differences were appropriate between insanity acquittees and others where findings of the kind here discussed were made. Clearly, there are respectable arguments to be made in support of such a position. But the issue before us is not whether we agree with the legislative judgment, but whether there is a rational basis for some differential treatment in the described circumstances sufficient to withstand the constitutional challenge here presented. In my opinion, it is quite clear that the circumstances with which we are concerned provided a rational basis for some differences in treatment sufficient to preclude a challenge on constitutional grounds.

It is of course fundamental that the procedures provided must comport with due process. It is equally fundamental that differences in treatment between insanity acquittees and others must be reasonably related to an appropriate public policy. Except for that aspect of the Court of Appeals opinion in *People v Escobar (supra)* that defined the standard of proof under CPL 330.20 as satisfied by the fair preponderance of evidence, I am aware of nothing in the statute that could even arguably be said to offend due process or violate a defendant's right to equal protection of the law.

But even the standard of proof determination in *Escobar (supra)* does not give rise to a genuine constitutional issue. The statute does not provide that the defendant may be committed under subdivision (14) if the court finds by the fair preponderance of evidence that he has a dangerous mental disorder. The burden set forth in the section and throughout the statute is to establish the prescribed condition "to the satisfaction of the court". In *People v Escobar (supra)*, the Court of Appeals found that this standard was intended to set forth a burden that would comply with Federal constitutional

standards, and concluded with regard to initial commitment and first retention hearings that the fair preponderance of evidence test complied with those requirements. If this court were to conclude that the Constitution required clear and convincing evidence in a subdivision (14) hearing that the defendant suffered from a dangerous mental disorder—a conclusion that seems to me unjustified under the facts of this case—the appropriate response would be to apply that standard.

Undoubtedly, it would be an unusual situation in which the same phrase defining the burden of proof in a statute is defined differently, depending upon the nature of the hearing at issue. But the possibility of such a distinction is inherent in the use of a term found by the Court of Appeals to have been intended to set forth a constitutionally acceptable burden. Although it would undeniably be troublesome for this court to define "to the satisfaction of the court" to mean something other than that which the Court of Appeals found with regard to other proceedings under the statute, such an approach would make more sense than to strike down as unconstitutional a burden of proof requirement that was intended to be construed by the court in a manner that would comply with Federal constitutional requirements.

Assuming that the court believes the burden of proof under subdivision (14) must be clear and convincing evidence to comply with the Constitution, the limited issue that would be raised by such a determination would be whether the evidence adduced at the hearing met that standard. In my opinion, for reasons apparent in the psychiatric history of the defendant described above, the evidence in fact satisfied the clear and convincing standard.

Let me be clear that I do not believe that the Constitution requires that in a subdivision (14) hearing the defendant's mental disorder be established by clear and convincing evidence under the circumstances here presented. What seems to me to underly the approach taken in the court's opinion—both in its obvious misreading of the statute and its inaccurate statement of the currently applicable constitutional principles —is a sense of disquiet about a situation that is not in fact before us—a situation in which a defendant, many years after the commission of the crime, may be committed to a secure facility on the basis of a finding that he suffers from a dangerous mental disorder established only by the fair pre-

ponderance of the evidence. I share the court's doubts as to the constitutional validity of the fair preponderance standard of proof in such a situation. Where a number of years have elapsed without incident since the commission of the crime, the justification for employing a standard of proof less than that constitutionally required in civil commitment proceedings seems tenuous indeed.

The concern which I share with the court majority as to the constitutional acceptability of the fair preponderance standard in such a situation is quite comparable to that expressed by the dissenting Justices of the Supreme Court in *Jones v United States (supra)*. As we have seen, the dissenting Justices acknowledged the constitutional appropriateness of a different burden of proof with regard to insanity acquittees for a limited period of time, ending with the maximum period of potential incarceration under the crime charged, but strongly objected to allowing a defendant to be institutionalized indefinitely until he could establish that he was no longer dangerous or mentally ill. Notwithstanding the majority opinion in *Jones*, I believe there would be a reasonable basis for requiring in a subdivision (14) proceeding proof by clear and convincing evidence in the situation that I have described.

But we are not presented with that problem in this case. Here we have a defendant who committed a violent crime, who was found not responsible because of a mental disease or defect, who continued to suffer from a major mental disease at the time of the hearing and was accordingly released on an order of conditions requiring his adherence to a treatment plan, whose mental condition deteriorated significantly within a few months, and who became the subject of a hearing resulting in a recommitment order only some eight months after issuance of the order of conditions. Under these facts, it seems to me clearly consistent with the presently controlling constitutional principles to apply the fair preponderance test set forth by the Court of Appeals in *People v Escobar* (61 NY2d 431, *supra*) to the proceeding that here took place.

Accordingly, the order of the Supreme Court, New York County (Carol Berkman, J.), entered July 22, 1986, committing defendant to the custody of the Commissioner of Mental Health for confinement in a secure facility for six months, should be affirmed.

MURPHY, P. J., and KASSAL, J., concur with ASCH, J.; SANDLER and CARRO, JJ., dissent in an opinion by SANDLER, J.

Order, Supreme Court, New York County, entered on July 22, 1986, reversed, on the law, and the matter remanded for further proceedings in accordance with the opinion of this court.